**The relief described hereinbelow is SO ORDERED.**

**SIGNED this 20th day of June, 2013.**



_____
Robert D. Berger
United States Bankruptcy Judge
_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF KANSAS

In re:

RONALD CRAIG ROBERTS and
KATHY PARKER ROBERTS,   Case No. 11-23478
      Debtors.

_____

### ORDER DENYING IN PART AND GRANTING IN PART
### TRUSTEE'S OBJECTION TO CONFIRMATION

This matter comes before the Court on the Chapter 13 Trustee's Objection to Confirmation of Debtors' Chapter 13 plan.[1] The Trustee objects to the plan because it proposes to allow the Debtors to keep their expensive home while paying nothing to general unsecured creditors. The Trustee argues that the monthly housing cost is not a reasonable and necessary expense; the plan was not proposed in good faith; and the plan is not feasible.[2] After considering the briefs submitted, the objection is denied in part and granted in part.

---

[1] Doc. 25.
[2] *See* Brief in Support of the Trustee's Objection to Confirmation, Doc. 89.

13.06.19 Roberts Objection to Confirmation.wpd

**I.     Jurisdiction.**

The Court has jurisdiction and this is a core proceeding pursuant to 28 U.S.C. §§ 1334 and 157(b)(2).

**II.    Findings of Fact.**

Ronald and Kathy Roberts (Debtors) filed for relief under Chapter 13 of the Bankruptcy Code on November 8, 2011, and filed an amended plan on May 18, 2012 (Plan).[3] Debtors filed bankruptcy when they became unable to meet their expenses after Mr. Roberts' business, DRA, lost a major customer.[4] In 2004, Debtors refinanced their home mortgage note, and in 2007 Debtors incurred additional debt secured by a second and a third priority mortgage in their residence. The value of the home is somewhere between $530,000 and $665,000, and the total amount of the three mortgages is $690,140.20. There is no equity in the home even though Debtors have lived there for over eight years.

According to Debtors, these junior liens were granted in an unsuccessful attempt to save Mr. Roberts' business.[5] DRA is no longer operational, and Mr. Roberts is now an employee of Team One Latin America.[6] In Debtors' original Chapter 13 plan, Debtors attempted to strip off the junior mortgages and to pay the first mortgage note outside the plan. However, because there was an arrearage of $11,161.46 on the first mortgage note, they amended their plan to include the payments on the first mortgage note.[7] Debtors' amended Schedules I and J show a monthly

---

[3] Doc. 56.
[4] Stipulation of Facts attached to Debtors' Brief in Opposition to Trustee's Motion to Dismiss and Objection to Confirmation, Doc. 90-1 at 2.
[5] Debtors' Brief in Reply to Trustee's Brief in Support of the Trustee's Objection to Confirmation, Doc. 93 at 2-3.
[6] Doc. 90-1 at 2.
[7] First Amended Chapter 13 Plan, Doc. 56.

- 2 -
13.06.19 Roberts Objection to Confirmation.wpd

Case 11-23478   Doc# 107   Filed 06/20/13   Page 2 of 19

income of $13,430 and expenses of $8,470. The Plan proposes to pay Debtors' entire disposable income of $4,960 for 60 months for a total repayment of $297,600.[8] The Plan will pay $39,851 of priority taxes, $219,480 towards the first priority mortgage note, $11,161.46 on pre-petition first mortgage note arrearages, and the remainder to attorney's fees and other expenses.[9] General unsecured creditors will receive nothing.

In addition to the first priority mortgage note payments paid through the Plan, Debtors have agreed to reaffirm the debt secured by the junior mortgage notes with creditor Bank of Blue Valley (BBV) for $107,816.47.[10] In the settlement with BBV, Debtors reaffirmed this debt in exchange for a better interest rate and a promise by BBV to withdraw its objection to confirmation for lack of good faith.[11]

Debtors' home is located in Johnson County, Kansas. The monthly mortgage note payment is $3,658,[12] which is over three times the average cost in Johnson County.[13] The Debtors' total monthly payment for housing expenses, including the mortgage note, utilities, and arrearages is $4,791, or 35 percent of Debtors' gross monthly income. The Debtors share one car, which is unencumbered, and do not have any other noteworthy expenses. This is both Debtors' first bankruptcy filing.[14]

---

[8] *Id.* at 1.
[9] *Id.* at 3-5.
[10] Joint Motion to Approve Compromise Between Debtors Ronald and Kathy Roberts and Bank of Blue Valley, Doc. 77.
[11] *Id.* at 2.
[12] Brief in Support of Trustee's Objection, Doc. 89 at 1.
[13] Department of Justice, *Means Testing Information, Local Housing and Utilities Standards* (Apr. 19, 2012 6:18 PM) http://www.justice.gov/ust/eo/bapcpa/20111101/bci_data/housing_charts/irs_housing_charts_KS.htm.
[14] Debtors' Brief in Opposition to Trustee's Motion, Doc. 90-1 at 2.

**III.     Discussion.**

The question before the Court is whether the Bankruptcy Code allows confirmation of a Chapter 13 plan in which debtors retain an expensive home and pay nothing to general unsecured creditors. The Trustee asserts that the answer to this question is no, and he provides three reasons. First, the Trustee asserts that the retention of the home is not reasonably necessary for the maintenance and support of the Debtors.[15] He argues that courts still have discretion post-BAPCPA[16] to make subjective determinations as to whether mortgage note and other house payments made by above-median income debtors qualify as "amounts reasonably necessary to be expended" under 11 U.S.C. § 1325(b).[17] Second, he argues that the Debtors' plan has not been proposed in good faith under § 1325(a)(3) because the extravagant mortgage note payments consume any potential dividend to general unsecured creditors.[18] Finally, the Trustee states that the Plan is not feasible because it is unclear whether the Debtors' projected disposable income will be sufficient to meet the proposed payments under the Plan.[19] The Court considers the arguments *seriatim*.

---

[15] Brief in Support of Trustee's Objection, Doc. 89 at 4.
[16] BAPCPA is an acronym for the 2005 amendments to the Bankruptcy Code titled the Bankruptcy Abuse Prevention and Consumer Protection Act.
[17] Any reference hereinafter to a section of law, without more, is to a section of the Bankruptcy Code, 11 U.S.C. §§101-1330 (2000) (hereinafter the Code).
[18] Brief in Support of Trustee's Objection, Doc. 89 at 10.
[19] *Id*. at 17.

- 4 -

**A. Whether the separate payments for the mortgage note, arrearage, and utilities are reasonably necessary for the maintenance and support of the Debtors according to the plain language of §§ 1325(b) and 707(b).**

In order for a court to confirm a Chapter 13 plan over an objection by either the trustee or the holder of an unsecured claim, a debtor must pay in full each allowed unsecured claim[20] or commit to the plan all projected disposable income to be received during the applicable commitment period.[21] "Disposable income" is a debtor's current monthly income (CMI), as defined by § 101(10A), less amounts reasonably necessary to be expended "for the maintenance or support of the debtor or a dependant of the debtor, or for a domestic support obligation, that first becomes payable after the date the petition is filed," for charitable contributions in an amount not to exceed 15 percent of the gross income of the debtor, and, if the debtor is engaged in business, for the payment of costs necessary for the continuation, preservation, and operation of the business.[22]

Under § 1325(b)(3), "[a]mounts reasonably necessary to be expended . . . *shall* be determined in accordance with subparagraphs (A) and (B) of section 707(b)(2)" if a debtor's current monthly income, when multiplied by 12, is greater than the median family income for a household of the same size, and in the same state, as the debtor.[23] This language instructs courts to follow the provisions of § 707(b)(2)(A) and (B) to determine what amounts are "reasonably necessary" to be expended for the Means Test purposes.[24]

The Trustee claims that the Debtors should not be able to keep their home because the

---

[20] 11 U.S.C. § 1325(b)(1)(A).
[21] 11 U.S.C. § 1325(b)(1)(B).
[22] 11 U.S.C. § 1325(b)(2); *In re Hays*, 2008 WL 1924233 (Bankr. D. Kan. 2008).
[23] Emphasis added.
[24] *See In re Hays*, 2008 WL 1924233, at *6.

- 5 -

total costs associated with it are not reasonable and necessary for the maintenance and support of the Debtors.[25] Although this objection is aimed broadly at the expenses required for the Debtors to retain their home, there are three separate deductions that must be discussed individually: the monthly costs of the mortgage note, the arrearage, and the utilities. Each of these deductions is covered by a separate subsection of § 707 and therefore each requires an individual analysis to determine whether it is "reasonably necessary."

**1. The Mortgage.**

The first deduction at issue is the mortgage note payment. Under the Means Test, mortgages and other secured debt are covered under § 707(b)(2)(A)(iii) which states:

> The debtor's average monthly payments on account of secured debts shall be calculated as the sum of—
> (I) the total of all amounts scheduled as contractually due to secured creditors in each month of the 60 months following the date of the filing of the petition; and
> (II) any additional payments to secured creditors necessary for the debtor, in filing a plan under chapter 13 of this title, to maintain possession of the debtor's primary residence, motor vehicle, or other property necessary for the support of the debtor and the debtor's dependents, that serves as collateral for secured debts;
> divided by 60.

There is no language in this section directing courts to question the reasonableness, or necessity, of any payments "contractually due" on secured debt held by above-median debtors.[26]

The Trustee argues that this reading of the statute results in a "blind, by-the-numbers approach" in which an above-median debtor may satisfy the "reasonably necessary" requirement

---

[25] Brief in Support of Trustee's Objection, Doc. 89 at 4.
[26] *See In re Wick*, 421 B.R. 206 (Bankr. D. Md. 2010) (holding that the court may not redefine "disposable income" or adjust "projected disposable income," simply because the amount of actual secured debt payments "appears disproportionate to the needs of the debtor").

- 6 -
13.06.19 Roberts Objection to Confirmation.wpd

simply by having a high mortgage note balance.[27] The Trustee's solution is to read § 1325(b)(2) to require, as a threshold matter, that each expenditure must be "reasonably necessary."[28] Under this interpretation, whether an expense meets this threshold requirement is a matter of judicial determination.

The Trustee cites *In re Konowicz*[29] to support the claim that § 1325(b)(2) requires the Court to make this initial determination.[30] In *Konowicz*, the court held that an expense must be "reasonable and necessary" as a "threshold requirement" under § 1325(b)(2) because "Congress intended the means test to approximate the debtor's reasonable expenditures on *essential* items."[31] The *Konowicz* court examined the debtor's housing and mortgage expenses together under § 707(b)(2)(A)(ii)(I) and (V) and determined that the IRS Local Standards should control whether an expense is reasonable and necessary.[32] According to the court, "any permitted deviation from the Standards should be limited to situations where either the code or equity mandates greater flexibility."[33] This is the same reasoning used by the court in *In re Loper*[34] when it found, under similar facts, that if the debtors had filed their case after BAPCPA went into effect, then their mortgage expense would be limited to the IRS Local Standards.[35]

This Court finds these cases unpersuasive. First, the court in *Loper* was speaking in *dictum*, and in any case, only looked to § 707(b)(2)(A)(ii) and ignored § 707(b)(2)(A)(iii).

---

[27] Brief in Support of Trustee's Objection, Doc. 89 at 5.
[28] *Id.*
[29] 470 B.R. 725 (Bankr. D.N.J. 2012).
[30] Doc. 89 at 5.
[31] 470 B.R. at 728 (quoting *Ransom v. FIA Card Services, N.A.*, 131 S. Ct. 716, 725 (2011)(emphasis in *Konowicz*)).
[32] *Id.* at 728-29.
[33] *Id.* at 728.
[34] 367 B.R. 660 (Bankr. D. Colo. 2007).
[35] *Id.* at 666.

13.06.19 Roberts Objection to Confirmation.wpd

Similarly, the court in *Konowicz* also did not consider § 707(b)(2)(A)(iii). Because subsection (iii) deals specifically with payments for secured debt, subsection (iii) controls and therefore the Debtors' actual payments, not the Local Standards, determine whether the expense is reasonable and necessary under § 1325(b).

Turning now to § 707(b)(2)(A)(iii), the decision by Congress to distinguish between two separate types of payments for secured debt belies the Trustee's argument that a threshold "reasonable and necessary" analysis is required. Judge Karlin summarized the point in *In re Hays*:

> In adopting § 707(b)(2)(A)(iii), Congress clearly chose to differentiate between normal, ongoing contractual payments due on secured debt, contained in subsection (I), and those payments that are required to cure a default on contractual payments due on a debtor's "primary residence, motor vehicle, or other property necessary for the support of the debtor and the debtor's dependents," set out in subsection (II). Section 707(b)(2)(A)(iii)(I) allows a debtor to divide "all amounts scheduled as contractually due to secured creditors" by 60 to arrive at a deduction for ongoing secured debt payments. Conversely, § 707(b)(2)(A)(iii)(II) only allows a debtor to deduct the additional payments necessary to cure a default on the debtor's home, car or other property "necessary for the support of the debtor and the debtor's dependents."[36]

If Congress had intended to include any of the restrictive language from § 1325(b)(2) or § 707(b)(2)(A)(iii)(II) in subsection (I), it could have done so. "Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion."[37] Moreover, an over-arching requirement that expenses be "reasonable and necessary," beyond the language of § 707(b)(2)(A) and (b), would render inoperative the

---

[36] 2008 WL 1924233, at *4.
[37] *Russello v. United States*, 464 U.S. 16, 23 (1983)(quoting *U.S. v. Wong Kim Bo*, 472 F.2d 720, 722 (5th Cir. 1972)).

requirement of § 707(b)(2)(A)(iii)(II) that only allows payments "necessary for the support of the debtor and the debtor's dependents." It is an "elementary canon of construction that a statute should be interpreted so as not to render one part inoperative."[38] This interpretation is followed by a majority of the courts that have ruled on the issue.[39]

It is undisputed in this case that Debtors have above-median income. As a result, under §§ 1325(b)(3) and 707(b)(2)(A)(iii), Debtors are allowed to deduct the full amount of their monthly mortgage payment from their projected disposable income, even if the result is that nothing is left for general unsecured creditors. Although the "reasonable and necessary" requirement contained in § 1325(b)(2) remains "generally applicable," the plain language of § 1325(b)(3) controls, and as a result, the amounts reasonably necessary to be expended "for the maintenance and support of the debtor or a dependent of the debtor" must be determined "in accordance with" § 707(b)(2)(A) and (B).

**2. The Arrearage**.

As for the arrearage that Debtors propose to pay through the Plan, § 707(b)(2)(A)(iii)(II) allows a debtor to deduct additional payments necessary to cure a default on the debtor's home, car, or other property "necessary for the support of the debtor and the debtor's dependents."[40] Although this language is more restrictive than subsection (I) because it only allows for

---

[38] *In re Hays*, 2008 WL 1924233, at *4 (quoting *Colautti v. Franklin*, 439 U.S. 379, 392 (1979)).
[39] *Baud v. Carroll*, 634 F.3d 327, 347-48 (6th Cir. 2011), stating:
> [A] majority of courts have held that above-median income debtors may deduct ongoing monthly payments on secured debt in accordance with the formula set forth in § 707(b)(2)(A)(iii) for property that debtors intend as of the date of confirmation to retain, regardless of whether the payments are subjectively reasonably necessary to be expended for the maintenance and support of the debtors or the debtors' dependents.

[40] *Hays*, 2008 WL 1924233, at *4.

necessary payments, there is nothing that directs the Court to determine whether the payments are reasonable.  Under this section, if a payment is necessary to cure a default on the Debtors' home, it is permitted.  Here, the payments are necessary to cure the default on the Debtors' home, which is specifically allowed under the statute.  Therefore, the arrearage payments also satisfy § 1325(b).

### 3. The Utilities.

The utilities, however, are listed under § 707(b)(2)(A)(ii)(I) and are guided by the Local Standards.[41]  The Local Standard for utilities in Debtors' county of residence at the time of filing was $482 and the Debtors are deducting $946. To the extent the deduction exceeds the amount provided in § 707, the excess amount is not reasonable and necessary under § 1325(b) and the Debtors must amend the Plan to comply with the Code.

**B.     The Plan was Proposed in Good Faith.**

**1. Good Faith, Generally.**

A plan may not be confirmed unless it has been proposed in good faith and not by any means forbidden by law.[42]  "Only if there has been a showing of serious debtor misconduct or abuse should a chapter 13 plan be found lacking in good faith."[43]  The Trustee asserts that the Debtors' high mortgage note and housing expenses, coupled with the failure to provide any dividend to general unsecured creditors, demonstrate serious debtor misconduct and therefore the Plan has not been proposed in good faith.  Put differently, the issue is whether a plan that

---

[41] "The debtor's monthly expenses shall be the debtor's applicable monthly expense amounts specified under the National Standards and Local Standards . . . ."  *See also Ransom v. FIA Card Servs., N.A.*, 131 S. Ct. 716, 722 (2011).

[42] 11 U.S.C. § 1325(a)(3).

[43] 8 COLLIER ON BANKRUPTCY ¶ 1325.04[1] at 1325-17 (Alan N. Resnick & Henry J. Sommer, eds., 16th ed. 2013).

- 10 -

13.06.19 Roberts Objection to Confirmation.wpd

satisfies the disposable income test under § 1325(b) may still fail for lack of good faith under § 1325(a)(3).

Whether a plan has been proposed in good faith is a question of fact.[44] However, the term "good faith" is not defined in the Code.[45] Because the term is not defined in the Code, Congress is presumed to have intended for it to be used in its ordinary sense.[46] The ordinary meaning of "good faith" is honesty of purpose.[47]

Determining whether a debtor has the requisite honesty of purpose in filing a plan can be a challenging endeavor.[48] Some of the confusion is a result of several Code amendments which have encroached upon or altered the way courts approach the good faith analysis.

In the Tenth Circuit, a determination of "good faith" requires an inquiry, on a case-by-case basis, into whether the plan abuses the provisions, purpose or spirit of Chapter 13.[49] Since 1983, this inquiry has been guided by a "totality of the circumstances" test.[50] In *Flygare*, the court outlined 11 factors "relevant to a determination of good faith."[51] However, since *Flygare*,

---

[44] *Robinson v. Tenantry (In re Robinson)*, 987 F.2d 665, 668 (10th Cir. 1993).
[45] *In re Loper*, 367 B.R. 660, 668 (2007).
[46] *See Keach v. Boyajian (In re Keach)*, 243 B.R. 851, 856 (B.A.P. 1st Cir. 2000) ("In the absence of contrary evidence, and there is no relevant legislative history, Congress presumably used the phrase 'good faith' in its ordinary sense.").
[47] *Id.* at 868.
[48] *See* Keith M. Lundin & William H. Brown, CHAPTER 13 BANKRUPTCY, 4TH EDITION, § 177.1, at ¶ 1, Sec. Rev. July 23, 2004, www.Ch13online.com (stating that this short provision has proven to be one of the most litigated provisions of the entire Bankruptcy Code).
[49] *Flygare v. Boldin*, 709 F.2d 1344, 1347 (10th Cir. 1983) (citing *In re Estus*, 695 F.2d 311, 315 (8th Cir. 1982)).
[50] *In re Cranmer*, 697 F.3d 1314, 1318 (10th Cir. 2012); *Flygare, supra*.
[51] *Flygare*, 709 F.2d at 1347-48 (quoting *Estus*, 695 F.2d at 317). The 11 factors are: "(1) the amount of the proposed payments and the amount of the debtor's surplus; (2) the debtor's employment history, ability to earn and likelihood of future increases in income; (3) the probable or expected duration of the plan; (4) the accuracy of the plan's statements of the debts, expenses and percentage repayment of unsecured debt and whether any inaccuracies are an attempt to mislead the court; (5) the extent of preferential treatment between classes of creditors; (6) the extent to which secured claims are modified; (7) the type of debt sought to be discharged and whether any such debt is non-dischargeable in Chapter 7; (8) the existence of special circumstances such as inordinate medical expenses; (9) the frequency with which the debtor has sought relief under the Bankruptcy Reform Act; (10) the motivation and

Congress has made two relevant changes to § 1325. First, Congress enacted the Bankruptcy Amendments and Federal Judgeship Act (BAFJA) in 1984, which created subsections 1325(b)(1)(B) and 1325(b)(2). Second, Congress enacted the Bankruptcy Abuse Prevention and Consumer Protection Act (BAPCPA) in 2005 which added subsection 1325(b)(3).

The result of these revisions is that there are now four separate, enumerated economic tests for confirmation in Chapter 13 of the Code. These tests are: (1) the best-interest-of-creditors test in § 1325(a)(4), which requires that unsecured claim holders receive through the plan at least what they would be paid in a liquidation under Chapter 7; (2) the feasibility test in § 1325(a)(6), which provides the upper limit of the effort that can be required of a debtor in Chapter 13; (3) the disposable income test in § 1325(b); and (4) the duration limitation in 1322(d), which defines the length of Chapter 13 plans.[52]

The enactment of these changes to the Code has caused debate as to whether many of the *Flygare* factors are still relevant. One need not look beyond this District to find decisions that struggle with whether a plan can satisfy these "economic" requirements, yet still not be proposed in good faith.[53] The Trustee asserts that all of the *Flygare* factors are still relevant to the good faith analysis based on the decision in *In re Sandberg*. In *Sandberg*, known colloquially as the "party-barge case," the debtor proposed to keep his $20,000 luxury boat, for which he still owed

---

sincerity of the debtor in seeking Chapter 13 relief; and (11) the burden which the plan's administration would place upon the trustee."

[52] Keith M. Lundin & William H. Brown, CHAPTER 13 BANKRUPTCY, 4TH EDITION, § 193.1, at ¶ 2, Sec. Rev. June 7, 2004, and § 496.2 at ¶ 5, Sec. Rev. Apr. 21, 2010, www.Ch13online.com.

[53] *See In re Sandberg*, 433 B.R. 837, 842 (Bankr. D. Kan. 2010) (questioning whether the "economic components of *Flygare's* good faith analysis have continued validity in light of the disposable income test of § 1325(b)(1)(B) as enacted by BAPCPA, and if so, what weight should be given them"), and *In re Hays*, 2008 WL 1924233, at *3 n.20 (Bankr. D. Kan. 2008) (stating that the court still maintains discretion to determine whether a plan has been proposed in good faith after it has found the challenged expenses reasonable and necessary, but declined to rule on the issue because it was not raised by the trustee).

$48,000, while only paying unsecured creditors a two percent dividend in his plan.[54] According to the court, the plan was not proposed in good faith despite satisfying the requirements of § 1325(b).

The court in *Sandberg* gave two reasons for its decision. First, the court held that because Congress chose not to amend §1325(a)(3) in 2005, the existing case law was not affected.[55] Second, the court held that the new economic tests would "wholly subsume[]" the good faith analysis and would render § 1325(a)(3) superfluous.[56]

Since *Sandberg* was decided, the Tenth Circuit has revisited the question of whether the good faith inquiry and the calculation of projected disposable income are separate questions.[57] In *Cranmer*, the debtor deducted his Social Security income (SSI) from his projected disposable income pursuant to § 101(10A)(B), thereby exempting the SSI from the plan. The trustee objected, arguing that because the debtor was not using the SSI to pay unsecured creditors, the plan was not proposed in good faith. The trustee's position was that compliance with the disposable income test alone was not sufficient to establish good faith.[58] The court disagreed.

The Tenth Circuit restated that the good faith determination requires an examination of the totality of the circumstances. However, the court went on to state that many of the factors are no longer relevant. It noted:

> Since *Flygare* was decided . . . the Bankruptcy Code was amended to include 11 U.S.C. § 1325(b). Section 1325(b)'s "'ability to pay' criteria subsumes most of the *Estus* factors" and, therefore, the good faith inquiry now

---

[54] *Sandberg*, 433 B.R. at 840-41.
[55] *Id.* at 848.
[56] *Id.*
[57] *In re Cranmer*, 697 F.3d at 1319.
[58] *Id.*

- 13 -

13.06.19 Roberts Objection to Confirmation.wpd

Case 11-23478   Doc# 107   Filed 06/20/13   Page 13 of 19

"has a more narrow focus." A bankruptcy court must consider "factors such as whether the debtor has stated his debts and expenses accurately; whether he has made any fraudulent misrepresentation to mislead the bankruptcy court; or whether he has unfairly manipulated the Bankruptcy Code."[59]

The *Cranmer* court concluded by stating that "[i]t was simply not bad faith for Cranmer to adhere to the provisions of the Bankruptcy Code and, in doing so, obtain a benefit provided by it."[60] According to the decision in *Cranmer*, following the provisions of the Bankruptcy Code does not constitute bad faith merely because the outcome is distasteful. Instead, the court must consider: (1) whether the debtor has stated his debts and expenses accurately; (2) whether he has made any fraudulent misrepresentation to mislead the bankruptcy court; or (3) whether he has unfairly manipulated the Bankruptcy Code, along with any other relevant factors.

Although the court in *Cranmer* was considering whether SSI deductions from projected disposable income were bad faith, and not deductions taken under § 1325(b)(3) and § 707(b)(2), the good faith analysis is the same. The SSI deduction is governed under § 101(10A)(B) and the deductions at issue here are found in § 707(b)(2). Both sections determine what is included in a debtor's projected disposable income under § 1325. Since both sections control what can be deducted from a debtor's projected disposable income, there is no reason to give more weight to one than the other, and therefore the good faith analysis detailed by the court in *Cranmer* also applies here.

---

[59] *Id.* at n.5 (internal citations omitted)(quoting *Educ. Assistance Corp. v. Zellner*, 827 F.2d 1222, 1227 (8th Cir. 1987)).
[60] *Id.* at 1319.

### 2. Application.

**i. Whether Inaccuracies in the Debtors' Statements Were Attempts to Mislead the Court.**

Intentional inaccuracy in the schedules and statements filed by a Chapter 13 debtor has often been a factor in denying confirmation or dismissing a case for bad faith.[61] The Trustee claims this factor weighs against the Debtors because "the statements of the Debtors' expenses (and exemptions) have fluctuated wildly throughout the case and appear to be more in the nature of manipulating the numbers to reach a desired result, rather than an accurate reflection of the Debtors' economic reality."[62] The Trustee points to the fluctuating value the Debtors have ascribed to the home, the alleged inflation of the Debtors' expected income and the alterations made to the Debtors' expenses in the amended Schedule J as evidence that the Debtors have not been completely honest with the Court.

The value ascribed to the Debtors' home has admittedly changed several times throughout this bankruptcy proceeding. However, this Court does not find that this was done to mislead the Court or creditors for two reasons. First, this case was filed in the midst of the "Great Recession" and has proceeded at a time when house prices have fluctuated significantly. Second, the final value was reached in agreement among the Debtors and mortgagees and is close to the value given by an appraiser.[63] Because the values provided early in the case were made at a time when valuations of expensive houses were difficult to establish, in addition to the fact that the Trustee has admitted the final valuation was accurate, this factor does not weigh

---

[61] *In re Wilcox*, 251 B.R. 59, 65 (Bankr. E.D. Ark. 2000).
[62] Doc. 89 at 13-14.
[63] The house is listed at $665,000 in the Reaffirmation Agreement, and the appraisal value was $695,500.

13.06.19 Roberts Objection to Confirmation.wpd

against the Debtors.

The Court also holds that the changes made to Schedules I and J were not fraudulent. Debtors increased their expected income on Schedule I from $144,000 to $161,000,[64] but did not provide any justification for their optimism, although Debtors' original Schedule I noted that Debtors anticipated a $24,000 per annum income increase. The fact that the Debtors' projected income was raised in the amended schedules as noted does not demonstrate an attempt to defraud the Court.

Finally the Trustee asserts the $1,027 per month reduction in expenses on the amended Schedule J constitutes "a nonproductive game of hide and seek in which debtors offer changing combinations of 'discretionary' and 'essential' expenses with budget amendments to answer every objection."[65] The Court does find it troubling that $600 of the $1,000 deduction in the monthly expenses will come from reduced income tax payments. However, the remaining reductions to the Debtors' monthly expenses, combined with the fact that Debtors share a vehicle that is paid in full, demonstrate an attempt at belt-tightening.

After weighing the Trustee's arguments, the Court finds that the documents and schedules filed by the Debtors have been accurate and do not evidence an attempt to mislead the Court.

### ii. Unfair Manipulation of the Bankruptcy Code.

The Trustee argues that the Debtors are unfairly manipulating the Bankruptcy Code by keeping an expensive house while paying nothing to general unsecured creditors. When

---

[64] Doc. 89 at 14.
[65] Doc. 89 at 15 (quoting Keith M. Lundlin & William H. Brown, CHAPTER 13 BANKRUPTCY, 4TH EDITION, § 165.1, at ¶ 19, Sec. Rev. June 14, 2004, www.Ch.13online.com.).

- 16 -
13.06.19 Roberts Objection to Confirmation.wpd

considering whether a debtor has unfairly manipulated the Bankruptcy Code, courts have treated this factor "as a catchall and base a finding of unfair manipulation of the Bankruptcy Code on a variety of circumstances ranging from inaccurate schedules and egregious prepetition conduct to serial filings."[66] Other examples include purchases of expensive homes on the eve of bankruptcy.[67] However, the retention of a home with high mortgage note payments, without more, does not support a finding that the plan was not proposed in good faith.[68]

Here, the Debtors have attempted to follow the Bankruptcy Code; they have pared their expenses and share a single car, they have amended their schedules to more accurately reflect their financial situation, and they ask to keep their house in which they have lived for eight years. This Court finds that Debtors did not unfairly manipulate the Bankruptcy Code.

### 3. Conclusion.

After considering the totality of the circumstances and evaluating all the relevant factors, including the accuracy of Debtors' statements, whether any inaccuracies were an attempt to mislead the Court, and whether the Debtors were attempting to unfairly manipulate the Bankruptcy Code, the Court finds that Ronald and Kathy Roberts filed their Plan in good faith in accordance with § 1325(a)(3).

### C.      Feasibility.

The final issue raised by the Trustee is that Debtors' plan is not feasible. A Chapter 13 plan cannot be confirmed unless the debtor will be able to make all payments under the plan and

---

[66] *Wilcox*, 251 B.R. at 66.
[67] *See In re Rice*, 72 B.R. 311 (D. Del. 1987).
[68] *See* 8 COLLIER ON BANKRUPTCY ¶ 1325.04[1] at 1325-17 (Alan N. Resnick & Henry J. Sommer, eds., 16th ed. 2013) (citing *In re Sweet*, 428 B.R. 917 (Bankr. M.D. Ga. 2010)).

- 17 -
13.06.19 Roberts Objection to Confirmation.wpd

Case 11-23478   Doc# 107   Filed 06/20/13   Page 17 of 19

to comply with the plan.[69]  Here, the schedules show that even though the Plan payments are high, the Debtors can meet their expenses and the Plan is feasible.  However, because the utility payments are not reasonable and necessary, the difference between the actual payments of $946 and the $482 allowed under § 707 must be paid into the Plan.  Debtors are granted 30 days from the date of this Order to amend their Plan and schedules as necessary to demonstrate feasibility and to reflect an increase of the Plan payment of $464 per month.

## IV.     Conclusion.

The Court concludes that the Bankruptcy Code does not prohibit Debtors from living in an expensive home while proceeding in a Chapter 13 case.  With the enactment of 1325(b), Congress effected two key changes to the Code.  Congress removed the discretion of the bankruptcy court to determine whether secured debt payments contractually due are reasonable and necessary for above-median income debtors.  By creating specific economic requirements for confirmation, Congress prevented courts from making subjective, inconsistent determinations of good faith based on the economic components of debtors' plans. Section 1325(a)(3) should not be used as a veto to disapprove plans on economic grounds when the proposed plan otherwise satisfies the specific requirements of § 1325(b).

However, because of the issue as to feasibility, the Court may not confirm the Debtors' Plan as proposed.  The Debtors are directed to file an amended plan as set out above.

IT IS SO ORDERED.

###

---

[69] *See* 11 U.S.C. § 1325(a)(6).

ROBERT D. BERGER
U.S. BANKRUPTCY JUDGE
DISTRICT OF KANSAS